# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JOSHUA BROWN,<br><br>    Plaintiff<br><br>              v.<br><br>CITY OF EASTHAMPTION;<br>EASTHAMPTION PUBLIC SCHOOL DISTRICT;<br>and KEVIN BURKE,<br><br>    Defendants. | Case No: |

## COMPLAINT AND JURY DEMAND

### INTRODUCTION

1. The City of Easthampton, the Easthampton Public School District ("EPSD") and Easthampton High School Principal Kevin Burke ("Burke") (together, "Defendants") caused and are liable for harm suffered by Plaintiff Joshua Brown while he was a student at Easthampton High School ("EHS"). Defendants fostered an environment of pervasive racial discrimination and harassment, and were responsible for other violations of Plaintiff's civil rights as detailed herein.

### PARTIES

2. Plaintiff Joshua Brown is an individual residing in Springfield, Massachusetts.

3. Defendant City of Easthampton is a municipal corporation duly organized and existing under the laws of the Commonwealth of Massachusetts.

4. Defendant Easthampton Public School District is a local administrative district under the Massachusetts Department of Elementary and Secondary Education and is located in Easthampton, MA.

5. Defendant Kevin Burke is an individual residing in Southampton, MA.

## JURISDICTION AND VENUE

6. This action is brought pursuant to 42 U.S.C. § 2000d and 42 U.S.C. § 1988.  This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1343.  This Court also has pendent jurisdiction under 28 U.S.C. § 1367 over the related claims pursuant to state law.

7. Venue is proper in this Court under 28 U.S.C. § 1391 because the events giving rise to this civil action occurred in this judicial district.

8. This Court has personal jurisdiction over all Defendants because Kevin Burke resides in Southampton in the Commonwealth of Massachusetts and was at the time of the facts herein employed by the EPSD, an administrative district within the Commonwealth of Massachusetts.  Furthermore, the City of Easthampton is a municipality within the Commonwealth.

## FACTUAL ALLEGATIONS

9. Josh Brown was subject to a chaotic and difficult life as a young person.  However, despite significant hardship and a notable lack of parental support, he raised himself to be a good student, an excellent athlete and a conscientious member of his community.  Until the incident giving rise to this Complaint, he was never involved with the criminal justice system.

10. Josh attended Easthampton High School from 2013 to 2017.

11. During his time at EHS, Josh, a student of color, regularly witnessed and was the victim of racist comments and innuendos and was subject to multiple incidents of racial discrimination and harassment.

12. These behaviors escalated during Donald Trump's presidential campaign and election in Fall 2016, during which students taunted Josh with "MAKE AMERICA GREAT AGAIN" (MAGA) flags and hats and attempted to engage him in fights.

13. After one such incident, Josh went to his guidance counselor, Mr. McGuire, who told Josh to "just ignore it." After this brush off, Josh felt that he had no recourse against this behavior, and he simply did his best to ignore the provocations.

14. Anonymous acts of racism were also prevalent. Racist graffiti was not uncommon. For example, in the 2016-2017 school year, a poster depicting a multicultural group, including a woman in a hijab, was defaced and not removed or corrected by staff.

15. EHS also failed to address flagrant displays of racist paraphernalia and posturing. For example, in Spring 2017 a student flew a full-sized confederate flag in the parking lot for an entire afternoon without any interference from EHS staff, teachers or administrators. The incident was eventually addressed but only after complaints from *parents*. Another student, in Spring 2017, wore a jacket entirely covered in a bright, huge image of a confederate flag. He was able to wear it all day on more than one occasion with no objection from teachers or administrators. Again, the student was only addressed and asked to remove the jacket after parents intervened.

16. Josh also encountered pervasive discussion with veiled undertones while participating in the EHS football program. As one of only three or four students of color on the football team, Josh felt extremely isolated and threatened by this environment. It was especially

discouraging to him when coaches would engage in such discussions, which became more frequent with the ascendency of Donald Trump as the Republican front runner and eventual Presidential nominee in 2016.

17. In Fall 2016, Josh witnessed a football teammate, a student of color, reduced to tears at a practice, after a white team mate made inflammatory and racist comments to the student of color. Josh did not see any coaches or teachers intervene.

18. This hostility was much more overt outside of school, even among Josh's own teammates. One evening in Spring 2015, Josh and a friend tried to go to a party at the home of an acquaintance they did not know well. When they arrived at what they thought was the correct house they were told that the party was "down the road." Following the directions, they found themselves at a large bonfire. The other people around the fire were all white, and Josh recognized a few from the football team. Shortly after he and his friends (who were also students of color) arrived, someone began to construct a cross in the fire. Josh and his friends quickly realized they were not safe and began to walk away. As they left the white students began to chant, "white power!"

19. In addition, the EPSD has acknowledged that overt acts of racism were prevalent in the larger City community during the 2016-2017 school year and had an impact on students at EHS. For example, racist graffiti was repeatedly painted on rocks at the top of Mt. Tom and dozens of pro-diversity "Good Neighbor" and "Black Lives Matter" lawn signs were stolen during a contentious public debate on Easthampton becoming a "sanctuary city."

20. During the presidential campaign of Donald Trump in Fall 2016, an adult resident of Easthampton managed to enter EHS grounds and made racist and threatening comments to a student of color.

21. This racially hostile environment has been well documented by the Massachusetts Office of the Attorney General ("OAG") in a report on its investigations into racial discrimination at EHS, dated August 25, 2017, as will be discussed in further detail below.

22. As further documented by the OAG, Josh in particular was the victim of Principal Burke and the EPSD's administration of a racially discriminatory disciplinary policy that led to Josh's arrest and prosecution for a racially motivated schoolyard altercation.

**SCHOOLYARD INCIDENT IN MARCH 2017**

23. On March 29, 2017, in this hostile environment of administrative neglect and racial discrimination, EHS Principal Kevin Burke received information that three students of color had hit a white student after school on the grounds of EHS.  Josh was identified as one of the students involved.

24. The white student involved was the son of the School Resource Officer who was also a member of the Easthampton Police Department.  This student had been a perpetrator of acts of racial hostility inside and outside of the school and was regarded as an instigator of hostile interactions with students of color.

25. For example, shortly after Donald Trump was elected President in November 2016, the Officer's son was seen parading around the school holding a Trump/Pence campaign sign.  He aggressively approached Josh that day, held the sign in Josh's face, and taunted him, jeering the name "TRUMP!"

26. Just prior to the schoolyard altercation, the Officer's son had sent a series of racist Snapchat messages to a former EHS student.  These messages were posted to Facebook and were viewed by many students in the EHS community.

27. Following the postings of the racist messages, it was alleged that Josh had invited the white student to a schoolyard fight to settle the dispute over the white student's racial hostility.

28. Having received the "challenge", the white student voluntarily appeared at the designated location in the EHS parking lot.

29. Word of the "challenge" had spread around school and the incident was attended by many other students.

30. As everyone assembled, Josh and two other students of color were alleged to have each thrown a punch and hit the white student.

31. Students witnessing the event, however, were allegedly laughing and even cheering the event.

32. It was further alleged that Josh threw a final single punch at the white student after another brief discussion.

33. After learning of the schoolyard altercation on March 29, 2017, rather than making a routine investigation of the incident and applying the usual disciplinary measures generally used in similar incidents involving white students, Principal Burke took the extraordinary step of referring the incident directly to the Easthampton Police Department on March 29, 2017.

34. According to the police narrative accompanying the application for a Criminal Complaint in Northampton District Court, on the day of the incident, instead of allowing the police

department to undertake an investigation in the ordinary course, and without any warrant, Principal Burke conferred with Officer Rick Rogalski (who also worked as Josh's football coach) and provided Officer Rogalski with personal identifying information, including Josh's home address, to aid in his seizure and arrest.

35. Officer Rogalski, in his capacity as a police officer, then used this information to effect Josh's arrest.[1]

36. According to Officer Rogalski's narrative of the incident, Principal Burke approached Officer Rogalski and insisted on arrest and prosecution for a crime, despite the protestations of the white student, the alleged victim of the incident.

37. In addition to the extremely troubling racist implications of their actions, Principal Burke and Officer Rogalski's actions reflected a clear conflict of interest, since their fellow administrator and School Resource Officer was the father of the white student involved in the incident.

38. Principal Burke and Officer Rogalski's actions resulted in Josh's prosecution as an adult by the Northwestern District Attorney's Office in Northampton District Court.

39. Worse still, the EPSD and the Police Department decided to make Officer Rogalski the School Resource Officer, despite his involvement in this incident.

40. This entire process was profoundly upsetting for Josh.  In addition to the usual stress and fear that criminal prosecution brings to any accused, Josh was facing an increasingly hostile environment at school.  The case was widely publicized and was the subject of much discussion between students and faculty.  The environment at EHS became so

---

[1] The Massachusetts Office of the Attorney General ("OAG") specifically cited Principal Burke's mishandling of this matter as an area of concern related to the disciplinary decisions for students of color.  See OAG Report and Memorandum of Agreement, attached here as Exhibit 1, at pp. 7-8.

uncomfortable and frightening to Josh that he dropped two classes to allow him to attend
school for half days to reduce the stress that he was feeling.

41. The decision to seek criminal prosecution solely for Josh and the other students of color
involved in the March 29th incident was done without any significant investigation or
deliberation, when such a decision would clearly not have been made if the accused were
white.

42. Following Josh's arrest and prosecution, EHS continued to mishandle bias-related
incidents.

43. In particular, a series of Instagram postings from accounts called
"Make.EHS.Great.Again" and "Make.EHS.Great.Again.Part2" were directed to and
targeted students who had expressed support for racial sensitivity and opposition to the
racist symbol of the confederate flag, which was displayed in hostile reaction by several
white students.

44. These postings, as well as efforts by white students to display the confederate flag on
school grounds, noticeably increased in and around late April to early May 2017 after it
was revealed that the Northwestern District Attorney's Office was agreeing to suspend
prosecution of Josh in an agreement for pre-trial probation.

45. Not a single white student responsible for any of the racist attacks and innuendos of
violence displayed at school or on Instagram in the 2016-2017 school year appears to
have been referred for criminal prosecution.

**THE OAG INVESTIGATION AND REPORT**

46. While involvement in a schoolyard fight would be a poor choice on anyone's part, it is,
unfortunately, a common occurrence in a high school.  The extreme response that

Principle Burke and the EHS administration had to this particular event, however, was highly unusual.  So unusual, in fact, that it sparked outrage and complaints from parents, community members and civil rights activists who complained that the EPSD and EHS had not properly handled what was clearly a bias related incident.

47. These complaints reached the Massachusetts Office of the Attorney General.  The severity and volume of the allegations prompted the OAG to conduct an investigation into EHS's treatment of students of color, as well as their poor handling of what was clearly a racially hostile environment festering in the school.

48. Starting in May of 2017, the OAG began to investigate not only the specific incident described above, but a string of other incidents that were brought to its attention during the course of interviews of EHS faculty and administration and the review of documents and data provided by EHS, EPSD, the Easthampton Police Department and the Department of Elementary and Secondary Education.

49. On August 25, 2017, the OAG produced its report, which found "a number of significant concerns" that required immediate attention regarding bias related problems in the EHS environment, as well as "significant racial and ethnic disparities in EHS's administration of student discipline."  See OAG Report and Memorandum of Agreement, (the "OAG Report") attached here as Exhibit 1, at pp. 2-3.

50. The OAG Report cited the EHS administration for not forcefully responding to or disciplining the creator(s) of these racist attacks described above.  Id. at pp. 5-6.

51. Moreover, as the OAG Report specifically found, Principal Burke and the EHS administration "treated physical incidents involving white students less severely than incidents involving students of color."  Id. at p. 6.

52. In fact, according to the OAG, Principal Burke was three to four time more likely to more severely punish a student of color than a white student for the same incident.  Id.

53. As the OAG indicated, in addressing and reporting on infractions committed by white students, "EHS appears to have used 'Other', rather than a specific Incident Type (e.g., 'Assault'), to indicate that an infraction was complicated and required a special disciplinary response."  Id.

54. This selective application of rules and disciplinary decisions resulted in milder discipline for white students.  Id. at pp. 6-7.

55. Amidst this backdrop of a growing racially hostile environment and EHS's discriminatory actions, the prosecution of Josh continued through to the Fall of 2017.

56. Following the publication of the OAG's report, and after Josh had been charged and subjected to the criminal court systems for over seven months, the District Attorney's office consented to the dismissal of the case.

57. Josh's high school experience was marred by a pervasive environment of racial hostility that festered due to the EHS administration's utter disregard for his needs and those of other students of color, as well as the administration's absolute failure to protect students of color.

58. Further, the people Josh had often relied on for guidance and support during the chaos and difficulty of adolescence, his football Coach Rick Rogalski and Principal Kevin Burke, ultimately treated him like a dangerous criminal rather than a teenager needing their continued support.

59. Josh, a once engaged and friendly young person, was stripped of his innocence when he was treated like a violent felon by being handcuffed, booked, arraigned, and prosecuted

for a schoolyard conflict that stemmed from an environment of racially hostility that grew
out of Defendants' neglect.

60. Not only was Principal Kevin Burke, the EPSD, and the City of Easthampton unable to
curtail the racial hostility, they exacerbated it through significant racial and ethnic
disparities in EHS's administration of student discipline.

61. Sadly, Josh's racially charged experiences with the Easthampton Police did not end with
his graduation from EHS or the dismissal of criminal charges in 2017.

62. Recently, one late evening in July 2019, Josh was a passenger in a vehicle being driven
by another person of color on Route 10 in Easthampton.  Although driving down the road
and committing no violations of law, an Easthampton police officer stopped the vehicle
and demanded that all occupants raise their hands so that the officer could see them.

63. The officer then demanded identification from the driver and all passengers, most of
whom, like Josh, were people of color.  As Josh was not driving he did not have a license
on him.  When he explained that he did not have his license, the officer simply told Josh
"I know who you are."

64. The officer alleged that he received a call about an altercation in a nearby neighborhood
and expressed his concern with gang activity in the area, which apparently is why he
stopped a vehicle occupied by young people of color that were not committing any
violation of law.

65. In the end, no arrest was made and no citations were issued.  Instead, Josh was left with
the lingering impression that he is not welcome in the City of Easthampton as a young
man of color.

**COUNT I**
**RACIAL DISCRIMINATION UNDER A FEDERALLY FUNDED PROGRAM**
**PURSUANT TO 42 U.S.C. § 2000d**
**(All Defendants)**

66. Plaintiff restates the allegations set forth above and incorporates each as if fully set forth herein.

67. As a student at EHS, Josh was subjected to a pattern of racial discrimination in his education, including but not limited to, a racially hostile environment that went unchecked and the racial disparity in administration of school discipline as described above.

68. As determined by the OAG, it was the practice of the EPSD and Kevin Burke to engage in the actions and omissions that led to this racial discrimination.

69. The EPSD, EHS and/or the City of Easthampton, receive Federal financial assistance.

70. Accordingly, Plaintiff was denied the benefits of and subjected to racial discrimination under a program of public education that received Federal financial assistance in violation of 42 USC § 2000d.

71. As such, Plaintiff is entitled to compensation for his damages, in an amount to be determined at trial, in addition to all reasonable costs and attorneys' fees under 42 U.S.C. § 1988(b).

**COUNT II**
**VIOLATIONS OF CIVIL RIGHTS**
**UNDER M.G.L. c. 76 § 5 and M.G.L. c. 12 §§ 11H and 11I**
**(All Defendants)**

72. Plaintiff restates the allegations set forth above and incorporates each as if fully set forth herein.

73. As a student in the Commonwealth of Massachusetts, Josh was entitled to a public education free from racial discrimination under M.G.L. c. 76 § 5.

74. As described above, and as specifically cited by the Office of the Attorney General, EHS, the EPSD, the City of Easthampton (through its police force) and Principal Kevin Burke engaged in a pattern of racial discrimination against Josh and other students of color in the administration of a racially disparate disciplinary policy in direct violation of M.G.L. c. 76 § 5.

75. Specifically, Josh's right to a public education free of racial discrimination was interfered with by coercion, when Principal Burke, personally and on behalf of the EPSD, in cooperation with the City, acted to have Josh arrested and prosecuted as described above.

76. Accordingly, Plaintiff has been denied the enjoyment of his rights secured by the constitution and laws of the Commonwealth through coercion in violation of M.G.L. c. 12 § 11H.

77. As such Plaintiff is entitled to an award of compensatory money damages, and other equitable relief, in amounts to be determined at trial, as well as reasonable costs and attorneys' fees under M.G.L. c. 12 § 11I.

## COUNT III
## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS
### (All Defendants)

78. Plaintiff restates the allegations set forth above and incorporates each as if fully set forth herein.

79. By deciding to refer Josh for arrest following a racially charged schoolyard incident when a white student would almost certainly not have been treated the same way, the EPSD

and Kevin Burke breached their duty of care to Josh, and set in motion a series of events that led to Josh's arrest and prosecution.

80. As a coach at EHS, Officer Rogalski owed Josh a similar duty of care.

81. By working together to acquire personal confidential information from school records to effect Josh's arrest, Officer Rogalski, Burke, the EPSD and the City, jointly and in concert, engaged in negligent conduct that breached their duty of care to Josh.

82. By effecting the arrest, which involved seizing Josh at a friend's house, handcuffing him, processing him through the Easthampton Police and Hampshire County Sheriff, and delivering him as a prisoner to the Northampton District Court for criminal prosecution, Officer Rogalski, Burke, the EPSD and the City, jointly and in concert, engaged in negligent conduct that breached their duty of care to Josh.

83. By allowing an environment of racial hostility to fester and failing to take adequate steps to correct it, Burke and the EPSD engaged in negligent conduct that breached their duty of care to Josh.

84. As a result of all Defendants' actions described herein, Plaintiff suffered emotional distress.

85. Any reasonable person in Plaintiff's situation would have suffered emotional distress.

86. The Defendants' negligence proximately caused Plaintiff's emotional distress, including but not limited to anxiety, loss of joy in life, fear and stress.

**COUNT IV**
**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**
**(All Defendants)**

87. Plaintiff restates the allegations set forth above and incorporates each as if fully set forth herein.

88. By referring Josh for arrest and criminal prosecution as described above, Burke, the EPSD, and the City (through the cooperation of Officer Rogalski and the Police Department) engaged, jointly and in concert, in conduct that was extreme, outrageous, and beyond all possible bounds of decency.

89. All Defendants knew or should have known that arresting Josh and delivering him to the courts for criminal prosecution would likely cause emotional distress.

90. Defendants' extreme and outrageous conduct proximately caused Plaintiff's emotional distress.

91. Josh's emotional distress has been, and continues to be, severe, and any reasonable person would have suffered such distress under the circumstances, including but not limited to anxiety, loss of joy in life, fear and stress.

## RELIEF REQUESTED

**WHEREFORE**, Plaintiff prays that this Court enter judgment in his favor:

(a) For compensatory and emotional damages in an amount to be determined at trial;
(b) For costs and reasonable attorneys' fees pursuant to 42 U.S.C. § 1988 and M.G.L. c. 12 § 11I.
(c) And for such other and further relief as this Honorable Court shall deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all claims so triable.

Dated:  August 16, 2019

Respectfully submitted,

JOSHUA BROWN
By his Counsel,


 /s/ Peter T. Lane
Peter T. Lane, Esq., BBO #673748
Mae Stiles, Esq., BBO #569537
FIERST BLOOMBERG OHM LLP
64 Gothic Street, Suite 4
Northampton, MA 01060
413-727-8300
lane@fierstbloomberg.com
stiles@fierstbloomberg.com